# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| SAMUEL R. HAYES, III | JURY TRIAL DEMANDED |
| Plaintiff, | |
| v. | Civil Action No. |
| ATL HAWKS, LLC and JASON PARKER, | |
| Defendants. | |

## COMPLAINT

COMES NOW Samuel R. Hayes, III ("Plaintiff"), through his undersigned counsel, and files this Complaint against ATL Hawks, LLC ("Atlanta Hawks") and Jason Parker ("Parker"), and shows the Court as follows:

## INTRODUCTION

1.

Plaintiff brings this action for race discrimination and retaliation pursuant to 42 U.S.C. § 1981 ("Section 1981").

## JURISDICTION AND VENUE

2.

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331.

3.

Pursuant to 28 U.S.C. § 1391 and Local Rule 3.1(B)(1)(a), venue is proper in this Court because the unlawful employment practices described herein were committed within the Atlanta Division of the United States District Court for the Northern District of Georgia.

## **PARTIES**

4.

Plaintiff is a citizen of the United States of America and a resident of the State of Georgia.

5.

Atlanta Hawks is a foreign corporation with a principal place of business in the state of Georgia.

6.

Atlanta Hawks availed itself of the privilege of conducting business within the state of Georgia.

7.

Atlanta Hawks may be served with process by delivering a copy of the Summons and Complaint to its registered agent, T. Scott Wilkinson, at 101 Marietta Street, suite 1900, Atlanta, Georgia 30303.

8.

Parker is a Georgia resident.

9.

During the time period when the events described in this lawsuit occurred, Parker was the Vice President of Customer Service and Security for the Atlanta Hawks. Parker currently is the Vice President of Customer Service and Operations for the Atlanta Hawks. Parker may be served with process by delivering a copy of the Summons and Complaint to his work address at 101 Marietta Street, suite 1900, Atlanta, Georgia 30303.

## **FACTUAL ALLEGATIONS**

10.

Plaintiff is black.

11.

On August 8, 2016, the Atlanta Hawks hired Plaintiff as the Manager of Security Operations.

12.

As the Manager of Security Operations, Plaintiff was responsible for managing the day-to-day security at Philips Arena (a multi-purpose indoor arena located in Atlanta) and for the Atlanta Hawks Basketball Club of the National Basketball Association. This involved managing a staff of more than forty people, hiring, firing, drafting security policies, implementing and enforcing security

policies, etc. In other words, Plaintiff was ultimately responsible for ensuring the safety and security of the Arena and its patrons.

13.

Plaintiff reported directly to Parker.

14.

Parker is white.

15.

Throughout Plaintiff's employment at the Atlanta Hawks, Plaintiff noticed that the security measures were enforced, or not enforced, based on race.

16.

On August 26, 2016, Drake and Future (both of whom are black) performed at Philips Arena. Both Drake and Future asked to bypass metal detectors but their requests were denied.

17.

One week later at the AC/DC concert at Philips Arena, Axel Rose and Brian Wilson (both of whom are white) requested to bypass metal detectors. Their requests were granted. In addition, Rose and Wilson requested that their vehicles be dropped off in the loading dock, in direct contravention of the Atlanta Hawks' building security protocol. Their requests were granted and their vehicles (neither of which

were swept for explosives) were permitted inside the loading dock (an area that is highly vulnerable to security threats).

18.

In September 2016, several staff members complained to Plaintiff that the Atlanta Hawks disparately enforced its security measures along racial lines, and that this practice had persisted long before Plaintiff started working at the Atlanta Hawks.

19.

Staff members observed that Parker and Security Systems Manager Megan Lodestro (who is white) demanded "extra tight security" at black shows, and denied black entertainers the same security privileges they granted to white entertainers. Staff members complained that these inconsistencies were racially motivated and caused confusion.

20.

As Plaintiff continued working at the Atlanta Hawks, it was obvious to Plaintiff that race (not safety) determined which entertainers and celebrities were permitted to bypass security protocol, and which entertainers and celebrities were not.

21.

On September 8, 2016 at the Bad Boy Family Reunion concert at Philips Arena, several black entertainers, including Sean "Diddy" Combs, requested to bypass metal detectors. Their requests were denied.

22.

Atlanta Mayor Kasim Reed (who is black) attended the Bad Boy Family Reunion concert as a ticket holder. Days before the concert, a member of the Mayor's security detail met with Parker to find out where the Mayor would be sitting during the concert. Plaintiff was present during that meeting. When the man requested permission to drop off the Mayor at the Media Entrance, Parker denied the request even though the Atlanta Hawks had granted the same request when made by white entertainers and celebrities.

23.

After the meeting, Parker vented that the Mayor "thinks he's a celebrity," that every time the Mayor comes in the building he "has this attitude that he deserves special privileges," and that the Mayor "thinks he owns the place."

24.

On September 12, 2016, at the Kanye West "Saint Pablo" Tour at Philips Arena, Kayne West (who is black) requested to bypass metal detectors. His request was denied.

25.

On September 30, 2016, at the "Comedy Get Down World Tour" at Philips Arena, three stars of the show, Cedric "The Entertainer," Eddie Griffin, and D.L. Hughley (all of whom are black) requested to bypass metal detectors. Their requests were denied.

26.

On October 15, 2016, at the "Amy Schumer Live" event at Philips Arena, Amy Schumer (who is white) requested that her entire production team bypass metal detectors for convenience. Her request was granted. In addition to bypassing metal detectors, Ms. Schumer's body guard, Seth (last name unknown), requested permission to drop off Ms. Schumer at the Media Entrance and park her vehicle at the Media Entrance. Plaintiff denied the request, which upset Seth. Plaintiff explained that even the Mayor of Atlanta was not allowed to use the Media Entrance. Seth escalated the issue to Live Nation Entertainment Production Manager Bill Allen (who is white), and Mr. Allen angrily confronted Plaintiff about saying no.

27.

On October 17, 2016, Plaintiff was called into a meeting with Parker. Parker scolded Plaintiff for not granting Mr. Allen's request, and told Plaintiff to write a letter of apology to Mr. Allen. Parker warned Plaintiff that people perceive him as "aggressive" because he is "a large black man with an intimidating voice and

commanding presence," and advised Plaintiff to "watch [his] tone" when conversing with others.

28.

During that meeting, Plaintiff complained that the Atlanta Hawks disparately enforced its security policies based on race and to the detriment of blacks, and that this was frustrating and confusing for Plaintiff and the staff. Parker was dismissive and clearly annoyed.

29.

On October 28 and 29, 2016, Adele (who is white) performed at Philips Arena. Adele's security detail requested to access Philips Arena through the loading dock and to park their vehicles in the loading dock for the duration of each show. Those requests were granted.

30.

On November 1, 2016, Plaintiff received a written warning from Parker for "negative interactions" with others and reiterated that Plaintiff should be "intentional" about being "respectful, professional, [and] mindful of [his] tone and approach."

31.

Plaintiff asked Parker why he was being written up for the same issues for which Parker had verbally coached Plaintiff during their meeting two weeks earlier. Parker said he decided to escalate the verbal coaching to a final written warning.

32.

On December 10, 2016, 2 Chainz, Jeezy and The Dream (all of whom are black) performed at the V-103 Winterfest Concert at Philips Arena. All three entertainers requested to bypass security. Their requests were denied and heightened security measures were enforced at that event.

33.

On December 29, 2016, at the WWE Live Tour at Philips Arena, several white performers requested certain security concessions, including special parking privileges, which were granted.

34.

On December 31, 2016, at the Old School Hip Hop Fest at Philips Arena, several black entertainers requested security concessions. Their requests were denied and heightened security measures were enforced at that event.

35.

In January or February 2017, Parker commended Plaintiff for doing a great job and for improving the attitude and morale of the security staff.

36.

On February 3, 2017, at the Kat Williams "Great America" Tour at Philips Arena, Kat Williams (who is black) requested to bypass metal detectors. His request was denied.

37.

On February 10, 2017, at the Bon Jovi concert at Philips Arena, Bon Jovi (who is white) requested to bypass the metal detectors. His request was granted.

38.

From February 15 to February 20, 2017, the Ringling Brothers and Barnum & Bailey Circus ("Ringling Bros.") performed at Philips Arena. Ringling Bros. requested permission for its production staff and workers to bypass metal detectors during that period. That request was granted.

39.

On March 4, 2017, Charlie Wilson (who is black) performed at Philips Arena. Several black celebrities who had bought tickets to the event requested to enter Philips Arena through the loading dock. Their requests were denied.

40.

On March 16, 2017, Migos (a black hip hop trio) performed during halftime at an Atlanta Hawks basketball game at Philips Arena. Migos requested to bypass security. That request was denied, and Migos and their entourage were subjected to

heightened security measures. Specifically, they were searched upon entering Philips Arena, and again by Plaintiff in their dressing room per Parker's orders.

41.

In or about March 2017, Parker referred to Plaintiff as "the large, angry black man." Parker joked that a Taco Mac employee had described Plaintiff in that way. Plaintiff objected to that label, but Parker continued to refer to Plaintiff "as the large, angry, black man."

42.

On or about March 28, 2017, Plaintiff suspended a staff member for insubordination. That staff member had been disciplined for multiple performance-related issues and had been given a final written warning prior to the suspension.

43.

On April 1, 2017, British rock group Radiohead performed at Philips Arena. After that event, an Atlanta Hawks security officer complained to Plaintiff about the demeaning way that he was treated by Radiohead's crew and the lack of support he received from management.

44.

The security officer (who is black) told Plaintiff that when a white crew member refused to walk through the metal detectors, the security officer told the crew member that he could not enter the building. In response, the white crew

member became belligerent and dropped his pants. Senior Event Manager Paul Krajewski (who is white) got involved and allowed the crew member to bypass the metal detectors.

45.

After the Radiohead concert, Plaintiff attended a meeting with several department heads to discuss that situation. During the meeting, Vice President of Philips Arena Barry Henson acknowledged that the security staff (all of whom are black) are treated worse than anyone in the building and needed more support.

46.

On April 9, 2017, rapper Nelly (who is black) attended the basketball game between the Atlanta Hawks and the Cleveland Cavaliers at Philips Arena. Nelly requested to be dropped off in the loading dock because his Mercedes-Benz Sprinter could not fit in the parking deck. Nelly's request was denied even though the Atlanta Hawks had granted the same request when made by white celebrities.

47.

On April 12, 2017, at the Ariana Grande "Dangerous Woman" Tour at Philips Arena, Ariana Grande (who is white) requested to bypass metal detectors and all search procedures because "she doesn't like people looking at her." Her requests were granted.

48.

Two security officers on the Atlanta Hawks staff were caught sleeping on duty during the Ariana Grande concert and were promptly terminated by Plaintiff.

49.

After the Ariana Grande concert, Plaintiff met with Parker and reiterated his complaint that the Atlanta Hawks' security protocol was disparately enforced based on race, that this practice compromised the security of the Arena and its patrons, and that this practice conflicted with the Atlanta Hawks' new commitment to racial diversity.

50.

Plaintiff told Parker that the staff continues to question why so many security concessions are made for white performers but not for black performers, and why security is often heightened at black shows but not at white shows.

51.

In response, Parker stated that "hip hop acts draw a different crowd, and the white acts bring in more money."

52.

Plaintiff subsequently spoke to Chief Diversity and Inclusion Officer Nzinga Shaw (who is black). Plaintiff stated that the security policies and procedures were being exercised in racially discriminatory ways and that Plaintiff had complained about this to Parker. Ms. Shaw suggested that Plaintiff arrange a meeting with

Parker's boss, Vice President and General Manager of Philips Arena Brett Stefansson. Plaintiff expressed concern that he would be retaliated against by Parker if Plaintiff spoke with Stefansson.

53.

On April 23, 2017, Tim McGraw and Faith Hill (both of whom are white) performed in their "Soul2Soul" concert at Philips Arena. They requested to bypass security at will so that they could go back-and-forth between the building and their work out trailers freely. Their request was granted.

54.

Actor Tyler Perry (who is black) attended the "Soul2Soul" concert as a ticketholder. When a member of Mr. Perry's security detail requested permission for Mr. Perry and his security detail to bypass the metal detectors, Event Manager Catie Scott (who is white) denied the request and gave the "everybody must go through security" spiel, which was a lie.

55.

Ms. Scott had no authority to unilaterally grant or deny requests to deviate from standard security protocol.

56.

On or about April 24, 2017, Plaintiff told Parker that members of the staff were still asking why security concessions are made for the white entertainers but

not for the black entertainers. Plaintiff explained that he didn't want to keep blowing them off because that leads to distrust and low morale, and Plaintiff had worked hard to improve morale.

57.

Parker acknowledged that Plaintiff had done an "incredible job" improving the attitude and morale of the staff, and joked that Plaintiff "had accomplished more in six months than the last guy had even started in one year." Parker told Plaintiff to send staff members who questioned the security practices to Parker.

58.

During the week of April 23, 2017 (after Plaintiff's meeting with Parker on April 24, 2017), Plaintiff spoke with Vice President and Chief Legal Officer T. Scott Wilkinson requesting a meeting to discuss certain issues that Plaintiff was facing. Plaintiff didn't tell Mr. Wilkinson what those issues were in advance of the meeting because he feared that Parker would get wind of the reason for the meeting and terminate Plaintiff in advance of the meeting.

59.

Plaintiff spoke with Mr. Wilkinson again later in the week and asked to postpone the meeting until after former Atlanta Police Department Chief George Turner (who is black) was onboarded as the new Vice President of Security (which

was to occur on May 1, 2017), after which time Plaintiff would be reporting to Turner rather than to Parker.

60.

On Friday, April 28, 2017 (one business day before Plaintiff would have begun reporting to Turner rather than Parker), Parker terminated Plaintiff.

61.

Parker told Plaintiff that although he had seen improvement in the way Plaintiff interacted with others, he was firing Plaintiff because he suspended a staff member for insubordination and terminated a staff member for sleeping on post without first consulting with Human Resources ("HR").

62.

Plaintiff was never told that he had to consult with HR before suspending or firing subordinates, and was not aware of any written policy governing the hiring, discipline, and/or firing of security personnel. (To Plaintiff's knowledge, no such policy existed at the time as such a policy had never been given to him despite repeated requests for such.) In fact, Plaintiff had previously terminated four to five other subordinates without first consulting HR and was never coached or reprimanded for doing so.

63.

That same day (April 28, 2017), Plaintiff sent an email to Mr. Stefansson, Ms. Shaw, and Mr. Wilkinson explaining why his termination was retaliatory and requesting reinstatement.

64.

The next week, Ms. Shaw contacted Plaintiff. She told Plaintiff that decisions about security have nothing to do with race, and that Parker told her that he (Parker) had six or seven people "lined up" who were prepared to state that Plaintiff was "difficult to work with." Ms. Shaw also told Plaintiff that he should have complained in writing before he was terminated, and that there was nothing she could do for him.

## COUNT I
## Race discrimination under 42 U.S.C. § 1981

65.

Plaintiff reasserts and incorporates by reference paragraphs 10 through 64 of this Complaint as if fully set forth herein.

66.

As an African-American, Plaintiff is a member of a racial minority.

67.

Defendants altered the terms and conditions of Plaintiff's employment and fired Plaintiff because of Plaintiff's race.

68.

Parker communicated with Plaintiff in a demeaning and derogatory way because of Plaintiff's race, and made statements that clearly indicated racial animus.

69.

Although Plaintiff was hired to manage the security operations, which necessarily required Plaintiff to be assertive and firm and to say "no" to any request that could potentially compromise building security, Parker indicated that Plaintiff must adopt a subservient demeanor because, as "a large black man with an intimidating voice and commanding presence," people perceived Plaintiff as "aggressive." In other words, Parker required Plaintiff to change his demeanor because he was black.

70.

Parker repeatedly referred to Plaintiff as "the large, angry Black man."

71.

Parker ignored Plaintiff's complaints about the Atlanta Hawks' racially discriminatory security practices, and defended those practices on the grounds that "white acts bring in more money."

72.

When Plaintiff spoke with Parker about implementing recruiting tools to diversify the demographic of the security staff (as every person on staff was black) consistent with the Atlanta Hawks' new commitment to racial diversity, Parker

responded, "I can see where having an entire staff of back people could be viewed as less than capable."

73.

Parker made the decision to terminate Plaintiff.

74.

Parker's decision to terminate Plaintiff was based on race, including racial stereotypes, myths, assumptions, and preconceived notions of blacks (especially black men) as "angry" and "aggressive."

## COUNT II
## Retaliation based on race under 42 U.S.C. § 1981

75.

Plaintiff incorporates by reference paragraphs 10 through 64 of this Complaint as if fully set forth herein.

76.

Defendants fired Plaintiff because he repeatedly complained that the Atlanta Hawks' security protocol was disparately enforced based on race and to the detriment of blacks.

77.

In October 2016, Plaintiff complained to Parker about the Atlanta Hawks' practice of selectively enforcing security measures based on race.

78.

Two weeks after that Complaint, Parker escalated the verbal coaching he had recently given Plaintiff (related to Plaintiff's "tone," "demeanor," and "aggressiveness") to a final written warning.

79.

In mid-April 2017, Plaintiff complained to Parker for the second time about the Atlanta Hawks' racially discriminatory security practices. Parker defended those practices on the grounds that "white events bring in more money."

80.

Thereafter, Plaintiff escalated his complaints of race discrimination to Ms. Shaw and requested a meeting with Mr. Wilkinson.

81.

On or about April 24, 2017, Plaintiff told Parker that staff members were still asking Plaintiff to explain why security concessions are made for the white entertainers but not for the black entertainers, and that Plaintiff was tired of blowing off their questions.

82.

On April 28, 2017, the same week that Plaintiff requested a meeting with Mr. Wilkinson, Parker terminated Plaintiff.

## Causation and Damages

83.

Plaintiff incorporates by reference paragraphs 10 through 82 of this Complaint as if fully set forth herein.

84.

As the direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered harm including (without limitation) lost wages, emotional distress, mental pain and anguish, and loss of enjoyment of life in an amount to be proven at trial.

85.

Defendants' acts were willful, intentional, wanton, reckless, and/or done without regard for consequences. Therefore, Plaintiff is entitled to an award of punitive damages against Defendants in an amount to be determined by the enlightened conscience of a jury.

86.

Plaintiff is entitled to recover his reasonable attorneys' fees and costs.

## **<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiff respectfully prays for relief as follows:

A. For a trial by jury;

B. For a verdict finding that Defendants violated Plaintiff's rights as set forth herein;

C. For a verdict in Plaintiff's favor for compensatory and punitive damages, pre-judgment interest thereon, and attorneys' fees and costs; and

D. For such other and further relief as this Court deems proper and just.

Date: July 3, 2017

Respectfully submitted,

SMITH LAW, LLC

By:   */s Louise N. Smith*
Louise N. Smith
Georgia Bar No. 131876
William J. Smith
Georgia Bar No. 710280
*Attorneys for Plaintiff*

3611 Braselton Hwy., Ste. 202
Dacula, GA 30019
T: (678) 690-5299
F: (844) 828-5615
louise@smithlaw-llc.com
william@smithlaw-llc.com

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed.R.Civ.P. 38(b), Plaintiff demands a trial by jury.

By:   */s Louise N. Smith*
Louise N. Smith
Georgia Bar No. 131876
*Attorney for Plaintiff*

## <u>FONT AND POINT CERTIFICATION</u>

The undersigned counsel for Plaintiff hereby certifies that the within and foregoing **COMPLAINT** was prepared using Times New Roman, 14-point font in accordance with LR 5.1(C).

This 3rd day of July, 2017.

By:   <u>*/s Louise N. Smith*</u>
Louise N. Smith
Georgia Bar No. 131876
*Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3rd day of July, 2017, I have caused or will cause service to issue upon the Defendants to this Action with the foregoing **COMPLAINT** by personal service pursuant to Fed. R. Civ. P. 4. within the time allowed by Fed. R. Civ. P. 4(m).

By:   <u>*/s Louise N. Smith*            </u>
      Louise N. Smith
      Georgia Bar No. 131876
      *Attorney for Plaintiff*

.